# United States Court of Appeals

## For the First Circuit

Nos. 02-2539; 03-1074

SANTOS RIVERA-TORRES; DAISY NAZARIO-SANTANA;
CONJUGAL PARTNERSHIP RIVERA-NAZARIO; YASIRA RIVERA-NAZARIO,
MINOR; ZAHIRA RIVERA-NAZARIO, MINOR,

Plaintiffs, Appellees,

v.

MIGUEL G. ORTIZ VELEZ, Mayor of the Municipality of Sabana
Grande; MUNICIPALITY OF SABANA GRANDE,

Defendants, Appellants.


APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]


Before

Selya, <u>Circuit Judge</u>,
R. Arnold, <u>Senior Circuit Judge</u>,[*]
and Lipez, <u>Circuit Judge</u>.


<u>Johanna M. Emmanuelli Huertas</u>, with whom <u>Jorge Martínez-Luciano</u>, and <u>Law Offices of Pedro E. Ortiz-Alvarez</u>, were on brief, for appellants.
<u>Francisco R. Gonzalez</u> for appellees.


August 26, 2003


[*]Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.  On February 21, 2001, plaintiffs Santos Rivera-Torres ("Rivera"), his wife (Daisy Nazario-Santana), and two daughters (Yasira Rivera-Nazario and Zahira Rivera-Nazario),[1] brought this claim against the municipality of Sabana Grande and four municipal officers pursuant to 42 U.S.C. § 1983. Rivera alleged that he was the victim of adverse employment actions motivated by political animus, in violation of the First and Fourteenth Amendments.  After a series of preliminary orders removing three of the four individual defendants from the action, the trial began on December 3, 2002, against the municipality of Sabana Grande and Miguel Ortiz Velez ("Ortiz"), the mayor of Sabana Grande, who was sued in both his individual and official capacities.  At the conclusion of the four-day trial, the jury found that "protected political activity was a substantial or motivating factor in the defendant's decision to politically discriminate against the plaintiff," and awarded Rivera $60,000 in lost wages and benefits,[2] $125,000 in compensatory damages, and $250,000 in punitive damages.  The jury also awarded compensatory damages in the amount of $75,000 to plaintiff's wife, and $30,000

---

[1]Because the claims brought by Rivera's wife and two daughters are derivative of Rivera's political discrimination claim, we designate Rivera the "plaintiff" and refer to the other co-plaintiffs by name where necessary.

[2]After the jury issued its verdict, the court sua sponte reduced the award for lost wages and benefits from $60,000 to $26,400.  Rivera does not contest this reduction on appeal.

-2-

to each of plaintiff's daughters. With several alterations, the court entered judgment on the jury's verdict, and the defendants filed these timely appeals.

Defendants raise a plethora of objections to the proceedings below, challenging inter alia the court's denial of qualified immunity, its refusal to stay proceedings pending the resolution of an attempted interlocutory appeal, various evidentiary rulings at trial, the court's interrogation of a defense witness, and the validity of the jury's damage award. After careful review of the record, we reject defendants' challenges and affirm the judgment.

## I.

In 1980, Rivera was hired by the mayor of Sabana Grande to work in various capacities at the municipal gym.[3] Plaintiff's duties included training boxers and weight lifters, teaching self-defense classes for children, and organizing weight lifting, boxing, gymnastics, and karate competitions at locations around Sabana Grande. Most municipal jobs in Puerto Rico are sub-classified as "career positions" (akin to civil service jobs) or "trust positions" (political appointments). Municipal employees are similarly designated "career" or "trust" employees. At all times, Rivera was a career employee, and his job was designated a

---

[3]The facts presented here are intended to convey a general impression of the case. We provide additional facts where they are pertinent to the legal analysis.

career position.  In 1992, twelve years after plaintiff was hired, the incumbent mayor promoted him to "be in charge of the gymnasium."  Although this managerial post was originally a "trust position," the municipality reclassified it as a career job to facilitate plaintiff's promotion.

At the time of the promotion, Rivera was a member of the Popular Democratic Party ("PDP"), though his allegiances were gradually shifting to the New Progressive Party ("NPP").  Over the next six years, from 1992 to 1998, Rivera's tenure as manager of the municipal gym was uneventful, and the record indicates that he received only positive employment evaluations.  In December 1998, plaintiff formally joined the NPP, and local party leaders asked him to run as the NPP candidate for mayor of Sabana Grande.  One week later, plaintiff publicly accepted the party's mayoral nomination at an NPP "plebiscite" (caucus).

Rivera's candidacy created a potentially awkward work environment.  His opponent in the mayoral election was incumbent mayor Miguel Ortiz Velez, who also happened to be plaintiff's boss by virtue of being mayor.  Rivera testified at trial that his relationship with Ortiz changed dramatically after he announced his candidacy.  That month, after returning from a three-week vacation, plaintiff discovered that the telephone had been removed from his office in the gymnasium.  Rivera also learned that the mayor was requesting daily reports on his work habits from other coworkers

stationed at the gym. In March 1999, the mayor observed Rivera outside his "area" during working hours, and ordered his secretary to make notations on plaintiff's time card documenting his absence from work. When plaintiff confronted the vice-mayor of Sabana Grande over the incident, he received a thirty-day suspension for "being disrespectful to the vice-mayor." Rivera appealed this suspension to the Commonwealth's Board of Appeals for the Personnel Administration System ("JASAP"), which reversed his suspension and awarded Rivera thirty days' back pay. The Board's decision was affirmed on appeal to the Commonwealth's Court of Appeals, and the Puerto Rico Supreme Court denied certiorari.

In the aftermath of the JASAP proceedings, Rivera continued to experience harassment at work. The locks on the gym were changed to inhibit his access, and on one occasion Rivera found a stack of his personal and office documents torn up next to a trash can near his office. He was stripped of authority to direct the activities of subordinates at the gym, and he had several prolonged arguments with Ortiz at the gymnasium. On one occasion, the mayor ordered him to complete maintenance tasks that were not within the scope of his duties. The defendants did not seriously dispute these incidents at trial.

In May 2000, Rivera sought and received an offer of state-level employment at the Commonwealth Department of Sports and Recreation in nearby Mayaguez. At the time, the head of the Sport

Administration Department was Eric Labrador, a fellow member of the NPP. Because Puerto Rico law prohibits individuals from simultaneously holding state and municipal-level employment, Rivera petitioned the municipality for a transfer. However, Mayor Ortiz refused to approve Rivera's transfer. Rivera testified that the mayor's secretary informed him that "the mayor would not sign unimportant papers."

Rivera was anxious to accept the state-level position before the November 2000 elections, anticipating that the employment offer would be rescinded if a PDP administration were elected into office. Thus, on June 5, 2000, Rivera submitted an irrevocable letter of resignation to the municipality. The consequences of resigning in lieu of obtaining a transfer were severe. Plaintiff stood to sacrifice the twenty years of seniority he had accumulated since 1980 for salary and benefit purposes. However, even this initiative proved unavailing when Ortiz refused to accept Rivera's resignation, citing an ongoing investigation into Rivera's excessive absenteeism over the previous five months. Mayor Ortiz testified at trial that under Puerto Rico law, a municipality loses the authority to discipline a municipal employee once that employee has been transferred to a state agency. Hence, it was critical to delay plaintiff's transfer request until the administrative investigation into his absenteeism had been resolved.

Rivera insisted that his absences were due to work-related illnesses, and he instructed his doctor, Silva Cherena, to submit medical reports to the municipality documenting his symptoms. Indeed, Dr. Cherena had sent plaintiff's medical information to the municipality on July 1, 2000. However, Mayor Ortiz's office claimed not to have received the doctor's letter until October 31, 2000. Two weeks later, Mayor Ortiz finally accepted Rivera's irrevocable resignation, nearly five-and-a-half months after it was tendered. In the intervening period, the NPP party had been voted out of key Commonwealth positions, and the job offer at the Commonwealth Department of Sports and Recreation was no longer available. Rivera was unable to find other work, and his family suffered significant financial and emotional hardship as a result.

In the opinion accompanying its November 26, 2002 order granting partial summary judgment to defendants, the district court distilled Rivera's accusations into five discrete allegations of political discrimination:

1) In January 1999, Defendants removed the phone from Plaintiff's office;

2) In January 1999, Defendant Ortiz ordered Arenas, another employee of the Municipality, to take on Plaintiff's job duties, supervise Plaintiff, and track his movements;

3) In March 1999, Defendants falsely accused and unjustly suspended Plaintiff for leaving his work-area and being absent from work;

4) In April 2000, Defendant Ortiz refused to approve Plaintiff's transfer to the Commonwealth's Sports and Recreation Department in Mayaguez;

5) On June 28, 2000, Defendant Ortiz declined to accept Plaintiff's resignation and then intentionally deferred the decision, accepting the resignation only after the elections.

The defendants conceded that Rivera had properly preserved allegations 4 and 5, but argued that the first three allegations were time-barred. The district court agreed, and dismissed allegations 1, 2 and 3 in its partial order of summary judgment on November 26, 2000. Of particular relevance to this case, the district court's November 26 order also denied Mayor Ortiz's request for qualified immunity. On December 3, 2002, the case proceeded to trial on Rivera's two preserved allegations of discrimination. The jury delivered its verdict on December 9, and these appeals followed.

**II.**

**A. Pre-Trial Rulings**

1. Denial of Summary Judgment

The defendants level a three-pronged attack on the district court's failure to dismiss Rivera's case outright on summary judgment. First, they argue that "the determination of the Court that plaintiffs had made out a prima facie case rested on evidence that was ultimately inadmissible at trial and on inferences from facts not properly on the summary judgment record." See Finn v. Consolidated Rail Corp. 782 F.2d 13, 16 (1st Cir. 1986)

("Material that would be inadmissible at trial cannot be considered on a motion for summary judgment because, if offered at trial, it would not serve to establish a genuine issue of material fact."). Second, defendants allege that Rivera failed as a matter of law to proffer evidence sufficient to overcome summary judgment. Finally, defendants challenge the district court's denial of qualified immunity at the summary judgment stage.

These objections are unavailing. Because the appeal in this case follows a full trial and verdict, the district court's rulings at the summary judgment stage were "overtaken by subsequent events":

> We need not address the merits of [a] preverdict challenge to the sufficiency of the evidence on the motion for summary judgment. Such an attack on the denial of defendant's motion for summary judgment "has been overtaken by subsequent events, namely, a full-dress trial and an adverse jury verdict" . . . . The rationale for this rule has been based on the procedural fact that a denial of a motion for summary judgment "is merely a judge's determination that genuine issues of material fact exist. It is not a judgment, and does not foreclose trial on issues on which summary judgment was sought." Hence, a challenge to the sufficiency of the evidence adduced on the motion to support the district court's conclusion that genuine issues of material fact exist will not lie on appeal.

Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams, Co., 40 F.3d 492, 500 (1st Cir. 1994) (internal citations omitted). Although Eastern Mountain specifically references sufficiency of the evidence challenges, objections to the court's pre-trial denial

of qualified immunity in its summary judgment ruling are subject to the same rule of trial preemption. As we noted in <u>Iacobucci</u> v. <u>Boulter</u>, 193 F.3d 14 (1st Cir. 1999), that rule generally bars non-interlocutory appeals grounded solely in error at the summary judgment stage:

> Although [the defendant] tried in this forum to assign error to the denial of that motion, a pair of procedural impediments frustrates the attempt. For one thing, an order denying summary judgment typically does not merge into the final judgment and therefore is not an independently appealable event if the case thereafter proceeds to trial.

<u>Id.</u> at 22 (citing <u>Eastern Mountain</u>, 40 F.3d at 497).

Consequently, although a post-trial grant of immunity would still confer a benefit on defendants by shielding them from any liability for monetary damages awarded by the jury, a defendant determined to persist in challenging the court's denial of qualified immunity cannot rest on the objection lodged at the summary judgment stage, but must move for judgment as a matter of law at the conclusion of the trial. If the court adheres to its original position, the defendant may then appeal from the denial of judgment as a matter of law. A contrary rule would contradict the principle enshrined in our jurisprudence that facts elicited at trial are often probative of the defendant's entitlement to qualified immunity. <u>See</u> <u>Stella</u> v. <u>Kelley</u>, 63 F.3d 71, 74 (1st Cir. 1995) (declining to permit interlocutory appeals from a court's rejection of qualified immunity "to the extent that it turns on

either an issue of fact or an issue perceived by the trial court to be an issue of fact"); 15A Wright, Miller & Cooper, Federal Practice and Procedure § 3914.10. ("[O]nce trial has been had, the availability of official immunity [on final judgment of appeal] should be determined by the trial record, not the pleadings nor the summary judgment record.").

Here, defendants failed to properly preserve their challenge to the court's denial of qualified immunity by restating their objections in a post-trial motion for judgment as a matter of law. Accordingly, we deem the defendants' challenge waived.

## 2. A Forsyth Appeal

On December 2, 2002 -- nearly one week after the district court's ruling granting partial summary judgment and denying qualified immunity -- Ortiz filed a notice of appeal of the district court's decision to deny qualified immunity. In Mitchell v. Forsyth, 472 U.S. 511 (1985), the Supreme Court ruled that a defendant denied qualified immunity by a district court could file an interlocutory appeal to obtain review of any disputed question of law. "[W]e hold that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Forsyth, Id. at 530. The Forsyth Court reasoned that "the entitlement [to qualified immunity] is an immunity from suit rather than a mere

-11-

defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. at 526 (emphasis in original).

The act of filing an interlocutory appeal has jurisdictional implications:

> The filing of . . . an interlocutory appeal, "confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982) (per curiam). The district court does not regain jurisdiction over those issues until the court of appeals issues its mandate. Courts have carved out a few narrow exceptions to this rule, such as where the defendant frivolously appeals or takes an interlocutory appeal from a non-appealable order.

United States v. Defries, 129 F.3d 1293, 1302-03 (D.C. Cir. 1997) (emphasis added). These exceptions to the jurisdictional rule recited in Defries figure prominently in the post-Forsyth jurisprudence of several circuits. In Apostol v. Gallion, 870 F.2d 1335 (7th Cir. 1989), the court of appeals observed that

> although [Forsyth] protects the interests of the defendants claiming qualified immunity, it may injure the legitimate interests of other litigants and the judicial system . . . . Defendants may seek to stall because they gain from delay at plaintiffs' expense, an incentive yielding unjustified appeals. Defendants may take Forsyth appeals for tactical as well as strategic reasons: disappointed by the denial of a continuance, they may help themselves to a postponement by lodging a notice of appeal.

-12-

Id. at 1338-39.  In a subset of interlocutory appeals of qualified immunity rulings, the "notice of appeal may be so baseless that it does not invoke appellate jurisdiction" even when filed.  Id. at 1339.  To address other "sham" appeals whose lack of merit is not so transparent as to preclude the transfer of jurisdiction to the appellate court in the first instance, the Seventh Circuit developed a "certification" process whereby "a district court may certify to the court of appeals that the appeal is frivolous and [retrieve jurisdiction to] get on with the trial."  Id.  The court admonished that

> [s]uch a power must be used with restraint, just as the power to dismiss a complaint for lack of jurisdiction because it is frivolous is anomalous and must be used with restraint. But it is there, and it may be valuable in cutting short the deleterious effects of unfounded appeals.

Id.  Following the Seventh Circuit's lead, the Sixth, Ninth, and Tenth circuits established similar certification procedures to address interlocutory appeals challenging the denial of qualified immunity ("Forsyth appeals").  See Yates v. City of Cleveland, 941 F.2d 444, 448-49 (6th Cir. 1991);  Chuman v. Wright, 960 F.2d 104, 105 (9th Cir. 1992); Stewart v. Donges, 915 F.2d 572, 577 (10th Cir. 1990).

The circuits adopting this certification procedure have held or implied that the district court's act of filing the

-13-

certification of frivolousness is an event of jurisdictional significance.

> [I]t is the district court's <u>certification</u> of the defendant's appeal as frivolous or forfeited rather than merely the <u>fact</u> that the appeal is frivolous which allows the district court to retain jurisdiction to conduct a trial . . . . Once a notice of appeal on an appealable issue such as qualified immunity is filed, the status quo is that the district court has lost jurisdiction to proceed. To regain jurisdiction, it must take the affirmative step of certifying the appeal as frivolous or forfeited, and until that step is taken it simply lacks jurisdiction to proceed with the trial.

<u>Stewart</u>, 915 F.2d at 577-78 (emphasis in original); <u>see</u> <u>also</u> <u>Chuman</u>, 960 F.2d at 105; <u>Yates</u>, 941 F.2d at 449; <u>Apostol</u>, 870 F.2d at 1339.

This proposition -- that a district court must actually file the certification of frivolousness to retrieve jurisdiction over the proceedings -- is the springboard for defendants' argument that the trial in this case was a nullity. On November 26, 2002, the district court initially entered an Opinion and Order denying defendants' pre-trial request for qualified immunity. On December 2, defendants responded by filing a notice of appeal from the denial of immunity and moving the district court to stay the proceedings pending the resolution of the appeal. Immediately thereafter they petitioned this court for a stay of the district

-14-

court proceedings.[4]   Without the benefit of an order from the

district court denying the motion to stay, we denied the requested

stay in a summary order issued that same day:

> The motion to stay trial is denied.  In denying appellants' motion for summary judgment based on qualified immunity, the district court stated that "Ortiz's motivation for denying and deferring Plaintiff's resignation is an unresolved issue of material fact."  As appellants have not adequately explained why the denial is immediately appealable, see Stella v. Kelley, 63 F.3d 71, 74 (1st Cir. 1995) ("a district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact"), the motion for stay is denied.

On December 3, 2002, the district court began the trial.

Meanwhile, defendants had filed a motion for reconsideration of our

December 2, 2002 order denying the stay.  By order dated December

6, 2002, we rejected the defendants' motion for reconsideration:

> To the extent that defendant is asking this court to immediately stay any further trial, the request is denied.  We request the district court, however, to expressly act on defendant's motion for stay. See Hegarty v. Somerset County, 25 F.3d 17, 18 (1st Cir. 1994); Chuman v. Wright, 960 F.2d 104, 105 (9th Cir. 1992) ("Should the district court find that the defendants' claim of qualified immunity is frivolous or has been waived, the

_____

[4]The district court's order of December 6, 2002 indicates that defendants filed both their notice of appeal and request for a stay with the district court at 4:48 p.m. on December 2.  Defendants also petitioned this court for a stay of the district court proceedings that same day, although the precise time this request was filed is not clear from the record.

> district court may certify, in writing, that defendants have forfeited their right to pretrial appeal, and may proceed with trial"). Any renewed request for a stay filed in the court of appeals must be accompanied by sufficient portions of the record to allow for intelligent review.

In the interim, however, the district court had nearly completed the trial. On December 6, after entertaining closing arguments and issuing instructions to the jury, the district court denied the defendants' motion for stay in an order dated that day:

> [O]ur denial of summary judgment turned on an unresolved issue of fact in a clearly established legal scenario strongly indicative of improper political discrimination. Under these circumstances, an appeal of an unresolved factual question is baseless and is not immediately appealable. Therefore, we necessarily certify that Defendant's appeal is frivolous under the present circumstances.

Rivera-Torres v. Ortiz-Velez, Civil No. 01-1244 at 5-6 (D.P.R. December 6, 2002). Defendants now insist that "[g]iven the uncontested fact that the Trial Court proceeded without jurisdiction, the judgment entered in the instant case suffers from the incurable vice of nullity and must be vacated."

This jurisdictional dispute might have been avoided if the district court had promptly ruled on the defendants' motion to continue the trial pending the resolution of their Forsyth appeal. See Fed. R. App. P. 8(a) ("A party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal."). Under well-settled law, courts

-16-

entertaining a motion for stay are compelled to evaluate the merits of the petition and anticipate its disposition on appeal. See Acevedo Garcia v. Vera-Monroig, 296 F.3d 13, 16 (1st Cir. 2002) ("The sine qua non of the stay pending appeal standard is whether the movants are likely to succeed on the merits.") (internal quotation marks and citation omitted). This evaluation closely resembles the frivolousness analysis required under the Apostol certification procedure, as the court's order of December 6 noting the unappealability of its qualified immunity ruling demonstrates. See supra. If the court had entered that order denying the stay on December 2, prior to beginning the trial, its jurisdiction over the proceedings would have been clearly established even without the inclusion of certification language in the opinion.

We have never adopted the Apostol certification procedure in this circuit. Although appellants urge us to do so here in the hopes of adding fuel to their trial nullity argument, we decline their invitation. Whatever the merits of the certification procedure may be, its primary innovation -- permitting the district court to reclaim jurisdiction from the court of appeals in the wake of a Forsyth appeal -- has no relevance to this case. The defendants' notice of appeal was patently meritless, and therefore failed to divest the district court of jurisdiction in the first instance. As we observed in United States v. Brooks, 145 F.3d 446 (1st Cir. 1998):

-17-

> [l]ike most rules, the rule that either the trial or the appellate court - but not both - may have jurisdiction over a case at any given point in time admits of some exceptions. Thus, a district court can proceed, notwithstanding the filing of an appeal, if the notice of appeal is defective in some substantial and easily discernible way (if, for example, it is based on an unappealable order) or if it otherwise constitutes a transparently frivolous attempt to impede the progress of the case.

Id. at 456. In this case, the defendants' interlocutory appeal was based on an unappealable order. As we ruled in Stella:

> a district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact . . . in such a situation, the movant must await the entry of final judgment before appealing the adverse ruling.

Stella, 63 F.3d at 74 (emphasis added). This principle, which we reiterated in our initial order denying defendants' request for stay, rendered the district court's denial of qualified immunity unappealable.

To avoid the application of this principle, appellants now lamely defend the legitimacy of their interlocutory appeal by arguing that the district court's qualified immunity determination turned on the legal question of whether a municipal officer's subjective intent is relevant to the qualified immunity analysis, and insisting that the court "improperly considered the element of subjective intent as part of the qualified immunity inquiry."

-18-

Superficially, Ortiz draws support for his opposition from the Supreme Court's decision in Crawford-El v. Britton, 523 U.S. 574 (1998), and our post-Crawford-El jurisprudence. See Tower v. Leslie-Brown, 326 F.3d 290, 296 (1st Cir. 2003); Abreu-Guzman v. Ford, 241 F.3d 69, 73 (1st Cir. 2001) ("Evidence concerning the officer's subjective intent is simply irrelevant to a qualified immunity defense."); Sheehy v. Town of Plymouth, 191 F.3d 15, 19 (1st Cir. 1999). To illustrate the flaw in Ortiz's argument, one must differentiate between constitutional violations that are strictly a product of the perpetrator's actions, and offenses where the perpetrator's subjective intent is an essential element of the violation. For example, an individual's Fourth Amendment rights are violated by the very fact that a police officer arrests him without probable cause, regardless of the officer's subjective intentions at the time of the arrest. See Abreu-Guzman, 241 F.3d at 73. Similarly, a suspect who is interrogated by the police without being advised of his right to counsel suffers a Fifth Amendment injury regardless of the questioning officer's intent or motives. In these situations, the rule of Crawford-El sensibly excludes evidence of the officer's intent from the qualified immunity analysis.

On the other hand, subjective intent is an essential element of political discrimination. We have previously observed that

> [w]hen a former government employee brings a First Amendment suit against his employer for taking an adverse employment action against him on the basis of his speech, the premier precedent is <u>Mt. Healthy City Sch. Dist. Bd. of Educ.</u> v. <u>Doyle</u>, 429 U.S. 274 (1977). Under the <u>Mt. Healthy</u> paradigm, the plaintiff must show both that his speech was constitutionally protected, <u>and that it was a "substantial" or "motivating" factor for the adverse action taken against him</u>.

<u>Stella</u>, 63 F.3d at 74-75 (emphasis added). In other words, an employee's First Amendment right to be free from political discrimination is violated when the employer's adverse employment decision is <u>motivated</u> by the employee's political speech. Hence, the employer's subjective motive is an essential element of the constitutional violation itself, and cannot be divorced from the qualified immunity inquiry. Our previous decisions underscore the importance of the employer's subjective intent in political discrimination cases:

> <u>Harlow</u> does not rule out the need to inquire into the actual reasons behind an official's conduct when the official's state of mind is a necessary component of the constitutional violation he allegedly committed . . . . [T]he official's abnormal expertise in law, or his subjective, below par, lack of expertise, makes no difference. But determining whether defendant fired an employee for a discriminatory reason . . . is an altogether different matter.

<u>Feliciano-Angulo</u> v. <u>Rivera-Cruz</u>, 858 F.2d 40, 45 (1st Cir. 1988). In <u>Acevedo-Garcia</u> v. <u>Vera-Monroig</u>, 204 F.3d 1 (1st Cir. 2000), we similarly dismissed defendants' contention that subjective intent

-20-

is irrelevant to qualified immunity, explaining that "[t]he plaintiffs allege that they were terminated because of their political affiliation, a constitutional claim that has no meaning absent the allegation of impermissible motivation." Id. at 11. Accordingly, the proffered legal basis for the defendants' Forsyth appeal is meritless, having been foreclosed by our prior decisions in Feliciano-Angulo and Acevedo-Garcia, see supra, properly cited by the district court in its order denying defendants' request for a stay, and characterizing the interlocutory appeal as frivolous.

Finally, we must note that the circumstances surrounding the defendants' Forsyth appeal betray its frivolousness. The district court's order of December 6 denying Ortiz's motion to stay the proceedings recounts that after the defendants' motion for summary judgment was denied on November 26, 2002, counsel for defendants failed to appear in court on December 2, the day the trial was scheduled to begin. Defendants insisted that they were unable to proceed because Johanna M. Emmanuelli-Huertas, the counsel of record for defendants, was simultaneously involved in another trial. The court rejected this excuse, sanctioned Emmanuelli's law firm, and rescheduled the trial for December 3. Later that day, Ortiz filed his notice of appeal, and immediately thereafter moved to stay the proceedings in the district court, asserting to the judge that "this Honorable Court lacks subject matter jurisdiction to submit co-defendant Ortiz-Velez to the

rigors of trial."[5]  The timing and haste of the defendants' notice of appeal reveals its intended purpose -- to cloak a request for postponement in Forsyth interlocutory raiments.  See Apostol, 870 F.2d at 1338-39 ("Defendants may take Forsyth appeals for tactical as well as strategic reasons: disappointed by the denial of a continuance, they may help themselves to a postponement by lodging a notice of appeal.").

In summary, we conclude that appellants' notice of appeal never divested the district court of jurisdiction, and we reject the claim that the entire trial was a nullity.

**B.  The Trial**

Defendants raise a handful of objections to the district court's evidentiary rulings and conduct at trial.  We address these claims in the order they were raised on appeal.

1.         The District Court's Admission of Evidence Regarding Dismissed Claims

Defendants argue that the district court erred in permitting the plaintiff to introduce evidence pertaining to

---

[5]On appeal, defendants argue that they were prejudiced by the district court's insistence on moving ahead with the trial notwithstanding attorney Emmanuelli-Huertas's simultaneous engagement.  "Attorney Martinez was faced with the daunting task of preparing to represent defendants at trial with less than 24 hours of preparation . . . . This situation put plaintiffs in an unfairly advantageous position, as they were represented by the attorney who handled their claims from the beginning while defendants were not."  While we reject the merits of this argument, see infra, it plainly reveals the tactical considerations motivating the defendants' Forsyth appeal.

allegations that were dismissed before trial as time-barred. "In general, we review judgment calls that certain evidence is either irrelevant or cumulative for abuse of discretion." Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 47 (1st Cir. 2001). As noted above, the district court's grant of partial summary judgment disposed of Rivera's claims arising from 1) the January 1999 deprivation of office equipment, 2) the mayor's January 1999 decision to strip Rivera of his duties and authority, and 3) Rivera's March 1999 suspension for "disrespecting" the vice-mayor. Significantly, the district court's summary judgment order anticipated that evidence concerning these dismissed claims could still be admissible at trial as relevant background: "Although we need not decide the issue at this time, it is possible that the time-barred prior incidents will be admissible as relevant background evidence." Rivera-Torres v. Ortiz-Velez, Civil No. 01-1244 at 16 n.5 (D.P.R. November 26, 2002) (citing O'Rourke v. City of Providence, 235 F.3d 713, 726 (1st Cir. 2001)). Indeed, the Supreme Court has observed that "[a] discriminatory act which is not made the basis for a timely charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977); see also O'Rourke, 235 F.3d at 726; Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 439 (1st Cir. 1997). The district court's prerogative to admit evidence of

dismissed claims insofar as it provides relevant background for surviving claims is firmly established by our precedents, and we discern no abuse of discretion in the court's exercise of this prerogative.

The defendants also ground their objections to the admissibility of "dismissed claims" evidence in Federal Rule of Evidence 403, arguing that "[o]nce a jury has heard about all these alleged, and time-barred, actions taken against plaintiff . . . it becomes almost impossible to make a fair assessment of the subsequent issues, which are the ones actually being tried." We disagree. The nature and severity of the events underlying the dismissed claims (including the confiscation of Rivera's personal telephone, the gradual erosion of his authority, and his thirty-day suspension) pale in significance to events that form the predicate of his surviving claims -- the refusal to approve Rivera's transfer, and the delayed acceptance of his letter of resignation. The dismissed claims involve employment decisions that resulted in inconvenience or brief financial hardship; the surviving claims implicate adverse employment acts that threatened plaintiff's livelihood. Accordingly, there was no abuse of discretion in the district court's implicit determination that the unfairly prejudicial effect of this evidence did not outweigh its probative value.

2. Cross Examination by the Judge

During the cross examination of Mayor Ortiz, counsel for Rivera interrogated the mayor about why he insisted on investigating plaintiff's sick leave absences in lieu of permitting his transfer to a position with the Commonwealth. In the midst of this line of questioning, the judge interjected with several of his own questions, resulting in the following exchange between the judge and the witness:

JUDGE: Well, there was no impediment in you giving him the transfer authorization irrespective of the investigation, correct?

WITNESS: Well, the fact of the matter is that the investigation had reflected that there had been improper use of the sick leave days. We would have to go to the municipality's regulations regarding the possibility of a violation of those regulations or of any law. And not doing so could have entailed a finding against us by the controller's office. It could be called negligence in the fulfillment of a supervisor's duties.

JUDGE: But even if he had been transferred, you could always have obtained relief from him if he had taken those days for the wrong reasons?

WITNESS: Well, at least regarding that aspect, he could have raised that matter when the letter was sent to Dr. Silva on June 25th. And then we would have consulted the attorney himself . . . or from OCALAR, which is the personnel agency for the Commonwealth which deals with these personnel affairs. And if they said this was okay, we would have issued the letter.

JUDGE: At this time when these things were happening had he already changed parties?

```
WITNESS:      Yes, he was already a candidate.  This was
              the year 2000.

JUDGE:        Don't you think it would have been prudent
              to allow him to go to the Commonwealth and
              out of Sabana Grande so that you wouldn't
              have any more problems with him?

WITNESS:      If we were to look at it from that point of
              view, it would have been beneficial for the
              municipality because we then would have had
              a regular position that we could have
              filled.  But the problem was that since he
              was under investigation we could not do so.
```

On appeal, defendants argue that

> this grilling of codefendant Ortiz, far from aiding the jury in understanding the evidence, was a cross examination, comprised mostly of leading and argumentative questions geared towards making the following point: the Mayor had no legal basis for denying plaintiff's transfer, this action was carried out while plaintiff was a candidate for Mayor, and defendant was not prudent in making this decision.

The Federal Rules of Evidence provide that "[t]he court may interrogate witnesses, whether called by itself or by a party." Fed. R. Evid. 614(b); see also United States v. Gonzalez-Soberal, 109 F.3d 64, 72 (1st Cir. 1997) ("It is well settled that the trial judge has a perfect right -- albeit a right that should be exercised with care -- to participate actively in the trial proper."). The judge's discretion to participate in the direct and cross examination of witnesses is cabined by the importance of maintaining an appearance of impartiality:

> There are, however, limits to the behavior that is permitted judges.  For example, the

-26-

judge's participation must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly. An inquiry into the judge's conduct of the trial necessarily turns on the question of whether the complaining party can show serious prejudice.

Id. (internal citations and quotation marks omitted).

On the cold record before us, the district court's questions suggest some skepticism about the mayor's proffered justification for denying Rivera's transfer. Ideally, the district court should have avoided this suggestion. However, given the brevity of the exchange and the mild nature of the questioning, we conclude that the district court's interjections did not result in "serious prejudice." Id. Furthermore, we find it significant that the judge issued a lengthy instruction to the jury that mitigated any prejudice arising from his interrogation of Ortiz.

> If I asked any questions, and I did ask questions in this case, which it is my duty to do so if I have to, you should not be influenced by anything that I said or did. The purpose of asking questions by me was to either highlight something that I thought was unclear from the evidence, something that was not developed by the lawyers that I thought should be developed or simply to give some perspective to the actual issue before the Court at that time.
>
> Judges, federal judges, have the right to ask questions. They have the right to call witnesses. They have the right to actually comment into [sic] the evidence if they want to comment on the evidence. And there is nothing wrong with that. The important thing is that I am not here to lead you into any particular result. I am here to just try to

-27-

> give you, with the assistance of the lawyer,
> the presentation of the best evidence possible
> so that you can decide the issues of fact.

(emphasis added). We have previously held that instructions of this nature may cure prejudice arising from a judge's active trial participation: "[A]ny possible risk of prejudice to [defendant] as a result of the judge's questions was abated by the clear instruction to the jury that it should ignore any impression that his questions might have made on them." United States v. Henry, 136 F.3d 12, 19 (1st Cir. 1998); see also Van Leirsburg v. Sioux Valley Hosp., 831 F.2d 169, 173 (8th Cir. 1987). In the end, we conclude that the district court's questioning of Ortiz did not give rise to reversible error.

3. Judicial Notice

At trial, the defense attempted to characterize the Commonwealth job for which Rivera sought a transfer as a "demotion" from his tenured position with the municipality. While the Commonwealth position was designated a "transitory," or temporary position, Rivera testified on cross examination that he stood to receive tenure from the Commonwealth after he had held the new position for "some months." To counter the impact of this testimony, the defendants asked the district court to take judicial notice of the fact that under Puerto Rico law transitory appointments may not be converted into tenured appointments. The judge, however, rejected defense counsel's request:

I can't take judicial notice of that for a reason. I have been dealing with this kind of case for over 16 years. And believe me, there are many instances in which a situation like this where the Puerto Rico government takes a person like this and takes a transitory position, puts the person in and down the road in two or three months they change it to a career position. That happens all the time . . . . It may be illegal. But I live in the real world. In the real world this happens every day in the Puerto Rico government. And this is -- this has been established by the case law. You have thousands of examples and there is no way I am going to instruct this jury about something that is not realistic.

Under the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(emphasis added). The district court is obligated to take judicial notice of such facts "if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). Here the court, drawing upon its experience, determined that the fact offered for judicial notice did not fulfill the requirements of Rule 201(b) because Puerto Rico law governing the duration of "transitory" government appointments does not always correspond to the realities of government practice. Therefore, in the court's view, taking judicial notice of the letter of the law would have misled the jury. On appeal, defendants offer no persuasive rationale for

reversing the court's reasonable application of Rule 201, and we decline to disturb the jury verdict on this ground.[6]

4. Refusal to Continue Proceedings

Finally, defendants argue that the district court abused its discretion in refusing to continue the proceedings to avoid a trial conflict involving the defendants' counsel of record. See Macaulay v. Anas, 321 F.3d 45, 48 (1st Cir. 2003). The record reflects that both parties filed a joint pre-trial memorandum on July 21, 2002, and that the pre-trial conference was approved by the district court on July 31, 2002. On August 1, 2002, the district court docketed its order setting December 2, 2002 as the starting date of the trial. Attorney Emmanuelli's law firm, which employs fifteen attorneys, accordingly had four months' notice of the trial date, and four months to bring another attorney up to speed on the specifics of this case. Instead, Emmanuelli waited until the day the trial was scheduled to begin to move the court for a continuance citing an irreconcilable conflict. These circumstances preclude any finding that the district court abused its discretion in denying the continuance.

---

[6]Defendants cursorily argue that the district court erred in admitting tape recordings of disparaging statements about plaintiff made by Ortiz during his election campaign. They intimate that the tapes were not properly authenticated, but provide no developed analysis or legal authority to support their assertion. Accordingly, we deem the argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory fashion, unaccompanied by some effort at developed argumentation, are deemed waived.").

## C. Post-Trial Rulings

1. Damages

At the conclusion of the trial, the jury awarded Rivera and his family the following damages: 1) $60,000 to Rivera for lost wages and benefits; 2) $125,000 in compensatory damages to Rivera "for emotional pain and mental anguish" (pain and suffering); 3) $75,000 in compensatory damages to Rivera's wife for pain and suffering; 4) $30,000 in compensatory damages to each of plaintiff's daughters for pain and suffering; and 5) $250,000 in punitive damages to Rivera alone. Hence, the jury's award of back pay was the only component of the damage award compensating an economic injury. In a post-trial order, the district court sua sponte reduced this element of the damages from $60,000 to $26,400, ruling that "the verdict has to be adjusted on the issue of lost wages because the only evidence is lost wages. There is no evidence of loss of benefits." Plaintiffs do not contest the court's reduction of this award on appeal.

Where defendants properly preserve a challenge to the amount of compensatory damages awarded by the jury, "our inquiry is limited to determining 'whether the trial court abused its discretion in refusing to set aside the verdict as excessive.'" Anthony v. G.M.D. Airline Servs., Inc., 17 F.3d 490, 493 (1st Cir. 1994) (quoting McDonald v. Fed. Labs., Inc. 724 F.2d 243, 246 (1st Cir. 1984)). The review of a preserved challenge to a punitive

-31-

damages award "is de novo, and the award will stand unless we find it 'certain' that the amount in question exceeds that necessary to punish and deter the alleged misconduct." Romano v. U-Haul Int'l, 233 F.3d 655, 672 (1st Cir. 2000). In this case, however, Ortiz and the municipality did not move for a new trial after the jury delivered its verdict, or file a post-trial motion to reduce or set aside the verdict as excessive. We have long held that defendants who fail to preserve challenges to the jury verdict below forfeit review of those claims on appeal: "We generally will not review a party's contention that the damages award is excessive or insufficient where the party has failed to allow the district court to rule on the matter." O'Connor v. Huard, 117 F.3d 12, 18 (1st Cir. 1997); see Carlton v. H.C. Price Co., 640 F.2d 573, 577 (5th Cir. 1981) (no appellate review of allegedly excessive or inadequate damages available where trial court was not given the opportunity to exercise its discretion on the matter), cited with approval in Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 811 (1st Cir. 1988); Braunstein v. Massachusetts Bank & Trust Co., 443 F.2d 1281, 1285 (1st Cir. 1971) (denying review of claim that award was excessive because appellant failed to raise the issue before the district court).

In this circuit, claims "forfeit[ed] through ignorance or neglect" may still be subject to plain error review on appeal. Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en

banc) ("Failures to object, unless a true waiver is involved, are almost always subject to review for plain error."). However, after reviewing the record, we discern no plain error that "resulted in a miscarriage of justice or seriously affected the fairness, integrity, or public reputation of the judicial proceedings." Smith v. Kmart Corp., 177 F.3d 19, 28 (1st Cir. 1999). The jury's award of compensatory damages was amply supported by the record, particularly the trial testimony of Daisy Nazario-Santana (Rivera's wife), Yasira Rivera-Nazario (Rivera's elder daughter), and Zahira Rivera-Nazario (Rivera's younger daughter), as well as Rivera's own description of the mental and emotional suffering he endured after losing his job. The jury's punitive damage award was also well within acceptable bounds, given the reprehensibility of defendants' conduct and the resultant injuries inflicted on Rivera and his family. See State Farm Mut. Auto. Ins. Co. v. Campbell, 123 S. Ct. 1513, 1520-21 (2003); BMW of North America, Inc. v. Gore, 517 U.S. 559, 574-76 (1996).

2. Municipal Liability

Question #1 on the special verdict form asked the jurors to determine whether "the actions of the defendant were under the color of the authority of the state." The jury responded in the affirmative. Question #9 then inquired whether "the claimed unconstitutional conduct of the mayor as a higher authority was done pursuant to the policy of the municipality of Sabana Grande."

-33-

The jury responded to this question in the negative. Initially limiting its focus to Question #9, the court remarked after hearing the verdict in its entirety that "According to [the special verdict form] the municipality did not have a policy. This thing was basically the mayor's thing. And I will then enter the appropriate judgment [in favor of the municipality]."

Upon further reflection, the court, citing to our decision in Cordero v. De Jesus-Mendez, 867 F.2d 1 (1st Cir. 1989), determined that it had erred in including Question #9 on the special verdict form. In Cordero, we acknowledged the Supreme Court's holding in Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) that "municipality liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483-84 (emphasis added). The Cordero court subsequently noted that mayors in Puerto Rico are the government officials ultimately responsible for the employment decisions of the municipality:

> Under Puerto Rico law, one of the express powers given to mayors of municipalities is: "To appoint all the officials and employees of the municipal executive branch, and remove them from office whenever necessary for the good of the service, pursuant to the procedures provided herein." P.R. Laws Ann. tit. 21, ch. 155 § 3002(15) (1980).

_Id._ at 7. Hence, Mayor Ortiz's employment decisions in the context of this case ipso facto "constituted the official policy of the municipality." _Id._ Therefore, as the district court correctly realized, the liability of the municipality could not be divorced from the mayor's liability in his official capacity. Because the jury expressly found in response to Question #1 that "the [unlawful] actions of the defendant were under the color of the authority of the state," municipal liability automatically attached.

We applaud the district court's prompt efforts to cure its initial error, and affirm its decision to disregard Question #9 on the special verdict form and enter judgment against the municipality. Significantly, the jury's responses to Question #1 and Question #9 did not create an inconsistent verdict to be resolved in accordance with Rule 49 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 49. The jury's response to Question #9 reflected its determination that the municipality had no freestanding laws or policies that allowed or encouraged the adverse employment decisions at issue. This determination was in no way inconsistent with its previous finding that the mayor, acting on his own initiative, discriminated against Rivera while discharging his duties as mayor. In the absence of a proper instruction, the jurors were unaware that Ortiz's actions as mayor _were themselves_ the "policy" of the municipality. Given these

circumstances, the district court's decision to disregard the jury's response to Question #9 is in accord with our resolution of the identical problem in <u>Cordero</u>, <u>see</u> <u>Cordero</u>, 867 F.2d at 8, and did not unfairly prejudice the municipality.

We reiterate that the municipality's contention that "[t]here is no evidence in the record, suggestive of the Mayor implementing any sort of municipal policy," simply misses the point. Ortiz had the authority to control the conditions of Rivera's employment by virtue of being the Mayor of Sabana Grande. The employment decisions he made in that capacity constituted the policy of the municipality under well-established precedent. <u>See</u> <u>Pembaur</u>, 475 U.S. at 483; <u>Cordero</u>, 867 F.2d at 7.

### III.

Our exhaustive review of the record and the arguments raised on appeal reveals no basis for disturbing the jury's liability determination or damage awards. The district court's entry of judgment on the verdict is **affirmed**.

**So ordered.**