# United States Court of Appeals
## For the First Circuit

No. 02-1529
   02-1838
   02-2076
   02-2077

MARIA E. GOMEZ, A/K/A MARIA E. GOMEZ CANDELARIA, ET AL.,

Plaintiffs, Appellees,

v.

JOSE A. RIVERA RODRIGUEZ, ETC., ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,

and Ponsor,* District Judge.

    Carlos A. Del Valle Cruz, with whom Anabelle Rodríguez, Secretary of Justice, and Ivonne Palerm Cruz, Deputy Secretary, were on brief, for individual capacity appellants.
    Ismael Rodríguez-Izquierdo for Municipality of Gurabo and official capacity appellants.
    Jorge Martinez Luciano, with whom Johanna M. Emmanuelli Huertas and Law Offices of Pedro E. Ortiz Alvarez, PSC were on brief, for Victor Rivera Hernández, Secretary of the Puerto Rico Department of Labor and Human Resources, amicus curiae.

---

*Of the District of Massachusetts, sitting by designation.

Pablo Landrau Pirazzi, with whom Eliezer Aldarondo Ortiz, Claudio Aliff Ortiz, Ivan Castro Ortiz, Simone Cataldi Malpica, and Aldarondo & Lopez Bras were on brief, for appellees.

September 18, 2003

**SELYA**, **Circuit Judge**.  These appeals involve claims of politically motivated discharges.  The twenty-four plaintiffs, all former employees of the Municipality of Gurabo (the Municipality), are members of the New Progressive Party (NPP).  They sued three defendants — the Municipality, its mayor, José A. Rivera Rodríguez (the Mayor), and its human resources director, Luz E. Rivera-Oyola — under 42 U.S.C. § 1983, alleging that a politically discriminatory animus accounted for their sudden unemployment.

The plaintiffs convinced both a jury and the district court of the accuracy of this claim; the jury awarded them substantial compensatory and punitive damages (enumerated in an appendix to this opinion), and the court ordered their reinstatement.  The defendants appeal, assigning error in a number of discrete respects.  After a painstaking review of the voluminous record, we conclude that the combined effect of two errors requires a new trial.  We also conclude that, as to Rivera-Oyola, the district court erred in failing to grant judgment as a matter of law.  The tale follows.

## I.  BACKGROUND

This case has a lengthy history, chronicled in a pair of lucid opinions.  See Gómez Candelaria v. Rivera Rodríguez, 218 F. Supp. 2d 66 (D.P.R. 2002) (Gómez I) (denying defendants' motions for summary judgment); Gómez Candelaria v. Rivera Rodríguez, 218 F. Supp. 2d 79 (D.P.R. 2002) (Gómez II) (denying defendants' motions

-3-

for post-trial relief).  We rehearse here only those details that help to frame the issues on appeal.

More than a quarter-century ago, the Puerto Rico legislature created "a special fund, separate and distinct from all other moneys or funds of the Commonwealth of Puerto Rico."  29 P.R. Laws Ann. § 711c(a) (1995) (Law 52).  This fund was to be

> continually at the disposition of the Secretary [of the Treasury] solely and exclusively for activities coordinated by the Employment Service of the Department of Labor and Human Resources directed to:  (1) Promoting employment opportunities with future possibilities as thus identified officially by the Department of Labor and Human Resources; (2) promoting jobs that are in demand in the present market; (3) and promoting the creation of high productivity employment opportunities.

Id. § 711c(b).  In practice, Law 52 soon became a vehicle through which the Commonwealth subsidized locally managed programs to ameliorate unemployment.

Despite this local emphasis, municipalities have no automatic entitlement to Law 52 grants.  To obtain funding, a municipality must submit a proposal describing how it intends to use the money.  Because such proposals must be approved by the Commonwealth's Department of Labor and Human Resources (DLHR) from year to year, jobs subsidized by Law 52 funds are transitory in nature, typically lasting for one year only.

Prior to the 2000 general election, the plaintiffs held municipal positions that had been created and funded under Law 52.

Most of them had been so employed, under serial one-year contracts, for periods ranging from two to seven years. The latest contracts were due to expire on December 31, 2000.

The general election in November of 2000 included a race for the mayor's office. Rivera Rodríguez stood for election as the candidate of the Popular Democratic Party (PDP). The plaintiffs openly opposed his candidacy, participating unabashedly in partisan marches, meetings, fundraisers, leaflet drops, and other political activities. Notwithstanding the plaintiffs' efforts, Rivera Rodríguez defeated the incumbent NPP mayor, Victor Rivera Acevedo.

Prior to the inauguration, the outgoing administration submitted an updated Law 52 proposal to DLHR. It also extended the plaintiffs' employment contracts through January 31, 2001. The changing of the guard took place on January 9, 2001, and the Mayor appointed Rivera-Oyola (a fellow PDP member) to the position of human resources director. Soon thereafter, the Municipality received word that DLHR would not approve the Law 52 proposal previously submitted by the lame-duck administration.[1] In lieu thereof, DLHR requested a reworked proposal based on the needs perceived by the new administration. As of the expiration date of the plaintiffs' contracts, no further Law 52 funds had been made

_____

[1]The PDP also had won the gubernatorial election in November of 2000 and its candidate had replaced an NPP incumbent. These facts may or may not have contributed to the rejection of the pending proposal.

available to the Municipality.  After discussing the lack of money with Rivera-Oyola, the Mayor, by letter dated January 30, 2001, notified the plaintiffs that their employment would cease the next day.[2]

Shortly thereafter, the Municipality submitted a revamped Law 52 proposal to DLHR.  The agency approved that proposal on February 14, 2001.  The job descriptions had changed and, prior to filling the newly sanctioned positions, the Mayor met with Luis Piñot Arecco (Piñot), DLHR's deputy secretary for legal affairs and norms.  The ostensible purpose of the meeting was to discuss the ground rules for the hiring of Law 52 employees.  When the Municipality eventually filled the new positions, the plaintiffs were left out in the cold.

Dismayed by these developments, the plaintiffs filed suit in the United States District Court for the District of Puerto Rico.  They alleged, inter alia, that the Mayor and Rivera-Oyola (who were sued in both their individual and representative capacities) had violated their freedoms of speech and association under the First Amendment in failing to renew their Law 52

---

[2]The parties stipulated that although Rivera-Oyola drafted the termination letters, she had no role in the decision not to renew the plaintiffs' contracts.  We discuss this stipulation in more detail in a subsequent section of this opinion.  See infra Part II(E).

employment contracts.[3]  The defendants denied that they had violated the plaintiffs' rights, asserting that the disputed employment decisions were the upshot of the new administration's differing policies as to how best to serve the needs of the community.

On January 22, 2002, the individual defendants moved for summary judgment.  They asserted, inter alia, that the complaint should be dismissed as to five of the plaintiffs because they had not sought renewal of their contracts; that the complaint should be dismissed as to Rivera-Oyola because of the parties' stipulation that she had not participated in the decision to let the plaintiffs' contracts expire, see supra note 2; and that the complaint should be dismissed as to the Mayor on the ground of qualified immunity because, given the guidance he had received from DLHR, it was objectively reasonable for him to believe that his conduct did not offend clearly established law.

The district court rejected the defendants' motion as to the five plaintiffs who did not seek reappointment, finding that each of them had a constitutionally protected property interest in continued employment.  In this regard, the court declared that:

> [W]hen there are funds available for renewal
> of Law 52 positions, transitory employees who

---

[3]In a second amended complaint, the plaintiffs added Piñot and the DLHR's Secretary (Victor Rivera Hernández) as defendants.  We need not dwell on this stratagem as the plaintiffs subsequently dropped these defendants.

have been continuously re-employed with previous Law 52 grants and who have been for all practical purposes refused re-employment, have at that point a property interest in their continued employment and therefore must be allowed and are entitled to a pre-termination hearing. Under these circumstances, if the contract of a Law 52 transitory employee is not renewed and another person who is affiliated with a rival political party is employed in his stead, the Law 52 transitory employees (Plaintiffs in this case) have a cause of action under the law not only for political discrimination but also for due process.

Gómez I, 218 F. Supp. 2d at 79. The court also refused to dismiss the complaint as to Rivera-Oyola, concluding that the record contained facts that contradicted the stipulation and that her position inherently "has more influence with decision-making matters than that of a general employee who merely follows orders." Id. at 75. The Mayor fared no better. In eschewing a grant of brevis disposition in the Mayor's favor on the ground of qualified immunity, the court noted that factual disputes as to his motivation remained to be resolved. Id. at 77.

The case proceeded to trial. The plaintiffs' case in chief was largely circumstantial. However, one plaintiff, Shirley Morales Rivera (Morales), testified over objection as to the substance of a conversation with the Mayor's wife, Mayra Pinero. According to this witness, Pinero stated (or, at least, intimated) that party affiliation would play a part in the Municipality's hiring practices.

At the close of the plaintiffs' case, the defendants moved unsuccessfully for the entry of judgment as a matter of law. Fed. R. Civ. P. 50(a). Just before the opening of the defense case, the plaintiffs moved in limine seeking to preclude Piñot's testimony. The district court granted this motion, and the defense proceeded without the benefit of its star witness.

At the close of all the evidence, the defendants again moved for judgment as a matter of law. The court rejected the motion. The jury found for the plaintiffs; its verdict rested on a finding that political affiliation was a substantial or motivating factor in the decision not to renew the plaintiffs' Law 52 contracts and/or not to recall them once DLHR had released the incremental Law 52 funds. Gómez II, 218 F. Supp. 2d at 83.

Following rendition of the verdict, the individual capacity defendants moved unsuccessfully for judgment as a matter of law, or in the alternative, a new trial. See id. at 89. These appeals followed (there are four, but the details need not concern us). We granted the Secretary of DLHR leave to appear as amicus curiae in connection with the district court's novel construction of Law 52.

## II. ANALYSIS

The Supreme Court has been unmistakably clear that nonpolicymaking public employees are constitutionally protected from adverse employment decisions on account of their political

affiliation.  See Rutan v. Repub. Party, 497 U.S. 62, 75 (1990); Branti v. Finkel, 445 U.S. 507, 516-17 (1980); Elrod v. Burns, 427 U.S. 347, 372-73 (1976) (plurality).  This constitutional doctrine is premised on the fact that politically motivated discharges impinge on core freedoms protected by the First Amendment, such as freedom of belief and freedom of association.  See Elrod, 427 U.S. at 355-58; Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000).

When a public employee advances a political discrimination claim against her employer, two principal questions arise.  First, the court must determine whether the plaintiff is the kind of employee whose job enjoys protection against political patronage.  See Branti, 445 U.S. at 517-20.  Basically, this protection extends to public employees who occupy neither policymaking positions nor positions of unusual confidence.  See Vazquez Rios v. Hernandez Colon, 819 F.2d 319, 322-26 (1st Cir. 1987).  We need not probe this point more deeply as the plaintiffs in this case held low-level jobs and the defendants have not claimed that political affiliation was an appropriate criterion for making decisions vis-à-vis those jobs.

The second question involves causation:  whether a plaintiff was denied, or banished from, public employment for political reasons.  This requires the plaintiff to show that political affiliation was a substantial or motivating factor in the

-10-

decisional calculus. <u>Mt. Healthy City Sch. Dist. Bd. of Educ.</u> v. <u>Doyle</u>, 429 U.S. 274, 287 (1977). If the plaintiff satisfies this burden, the devoir of persuasion shifts to the defendants to prove that they would have taken the same action regardless of the plaintiff's political affiliation. <u>See</u> <u>Padilla-Garcia</u>, 212 F.3d at 74 (citing <u>Mt. Healthy</u>, 429 U.S. at 287). The causation question typically is grist for the factfinder's mill. <u>See</u> <u>Lewis</u> v. <u>City of Boston</u>, 321 F.3d 207, 218-19 (1st Cir. 2003); <u>see</u> <u>also</u> <u>Dedham Water Co.</u> v. <u>Cumberland Farms Dairy, Inc.</u>, 972 F.2d 453, 457 (1st Cir. 1992).

In these appeals, the defendants' primary contention is that the district court committed crucial instructional and evidentiary errors that unfairly influenced the jury's resolution of the causation question. In the pages that follow, we discuss a claim of instructional error, two claims of evidentiary error, and a claim that one defendant (Rivera-Oyola) was entitled to judgment as a matter of law.

### A. **Status of Law 52 Employees**.

The defendants and the amicus (whose assistance we appreciate) object to the district court's holding that Law 52 contract employees have a property interest in their continued employment. The court originally made this holding in denying the defendants' motion for summary judgment, <u>Gómez I</u>, 218 F. Supp. 2d

at 77-79, and later instructed the jury to the same effect.  We deal first with this point.

We begin with an explanation of why it makes a difference whether a public employee has — or does not have — a property interest in her employment.  An employer usually can dismiss an at-will employee without any special ceremony.  See Smith v. F.W. Morse & Co., 76 F.3d 413, 426 (1st Cir. 1996) (explaining that "an employer can give an at-will employee — even one who has been a stellar performer — her walking papers at any time, for any reason or no reason").  A public employee may, however, acquire a property interest in continued employment.  In that event, the employer cannot dismiss her (and, thus, deprive her of her property) without affording her due process.[4]  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985).

Against this backdrop, we turn to the case at hand.  A constitutionally protected property interest in continued public employment typically arises when the employee has a reasonable expectation that her employment will continue.  See, e.g., Rivera-

---

[4]The due process issue may at first glance appear to be purely academic, as the plaintiffs obtained complete relief on their First Amendment claims.  We nonetheless treat this issue for two reasons.  First, the case will have to be retried, see text infra, thus wiping the slate clean.  Second, the district court seems to have grounded its denial of brevis disposition vis-à-vis the five plaintiffs who did not seek renewal of their Law 52 contracts on its property interest holding.  Because that rationale is insupportable, the status of these five plaintiffs will have to be reexamined by the district court.

Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir. 1992). Under ordinary circumstances, an at-will employee lacks a reasonable expectation of continued employment (and, thus, has no property interest in her job). King v. Town of Hanover, 116 F.3d 965, 969 (1st Cir. 1997). This is true of so-called transitory public employees in Puerto Rico. See, e.g., Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 94 (1st Cir. 1997) (explaining that "transitory employees generally do not have a property interest in continued employment beyond their yearly terms of appointment"); Caro v. Aponte-Roque, 878 F.2d 1, 4 (1st Cir. 1989) (similar).

Despite this body of law, the district court concluded that Law 52 employees enjoy a property interest in continued public employment. In reaching this conclusion, the court recognized that "a property interest is not generally granted to transitory employee positions because these positions are created to fill an employer need or to perform specific tasks of a finite duration." Gómez I, 218 F. Supp. 2d at 78 (emphasis in original). The court regarded positions subsidized under Law 52 as an exception to this rule because the "transitory nature[]" of such positions is "predicated upon the approval of Law 52 proposals and the subsequent availability of funds and [is] not based merely on employer need." Id. at 78-79.

Although we agree with the district court's premise — Law 52 positions do depend to some extent on DLHR's approval of annual

-13-

proposals and the concomitant release of funds — we cannot accept the court's conclusion that individual employees are entitled to property interests in the positions themselves. There is nothing in either the language or the legislative history of Law 52 that would except positions subsidized thereunder from the operation of the usual rule. The district court therefore erred in holding that the plaintiffs had property interests in their Law 52 employment beyond the stated duration of their annual contracts.[5]

## B. **Piñot's Testimony**.

The next battleground that we visit concerns the district court's decision to bar the testimony of Piñot (whom both sides had identified in the joint pretrial order as a fact witness to the events leading to the Mayor's actions). The court predicated its decision on two grounds: (1) that the defendants had failed to submit a written report detailing Piñot's intended testimony or otherwise to satisfy the disclosure requirements imposed by Fed. R. Civ. P. 26, and (2) that Piñot's testimony would inevitably encompass his interpretation of Law 52, thus encroaching on the

---

[5]This determination in no way alters the First Amendment analysis. Public employees can never be fired in violation of their First Amendment rights. "Thus, the fact that a transitory employee does not have a reasonable expectation of renewal in his or her employment . . . does not defeat a First Amendment claim." Nieves-Villanueva, 133 F.2d at 98; accord Cheveras Pacheco v. Rivera Gonzalez, 809 F.2d 125, 127-29 (1st Cir. 1987) (holding that transitory employees are entitled to protection under the Elrod/Branti line of cases).

judge's domain.  Gómez II, 218 F. Supp. 2d at 87.  We test these premises.

   **1. Fed. R. Civ. P. 26**.  The trial court worried that the proffered testimony was, in the court's own words, "in actuality that of an expert."  Based on this conclusion, the court ruled that Piñot could not testify because the defendants had neglected to comply with the expert witness requirements of Rule 26.  So viewed, the preclusionary order was a sanction for a discovery violation, which we review for abuse of discretion.  Macaulay v. Anas, 321 F.3d 45, 51 (1st Cir. 2003); Jackson v. Harvard Univ., 900 F.2d 464, 469 (1st Cir. 1990).

   We start — and, in this case, stop — with the question whether the district court abused its discretion in invoking the expert witness requirements of Rule 26.  We approach this question mindful that a court abuses its discretion if it ignores a material factor deserving significant weight, relies upon an improper factor, or assesses only the proper mix of factors but makes a serious mistake in evaluating them.  Indep. Oil and Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).  Superimposed on that rubric is the principle that "mistakes of law . . . always constitute abuses of a court's discretion."  Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001).  For the reasons that follow, we conclude

that the district court misclassified the proffered testimony and, accordingly, erred as a matter of law.

Fed. R. Civ. P. 26 is an integral part of the machinery devised to facilitate the management of pretrial discovery. Among other things, the rule places on litigants an affirmative duty to furnish, in advance of trial, "the name . . . of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses . . . [and to] identif[y] the subjects of the information." Fed. R. Civ. P. 26(a)(1)(A). The record demonstrates that the instant defendants complied with this provision. In the joint pretrial order, they listed Piñot as a potential witness, indicated his position with DLHR, and stated that he would "testify regarding the meeting held with [the Mayor] over the discussion of the 2001 Law No. 52 proposal approval, the guidance requested by the [Mayor] regarding the former employees and the criteria provided for the mentioned issue." The statement left no doubt that Piñot was a fact witness who possessed discoverable information. See Cusumano v. Microsoft Corp., 162 F.3d 708, 716 n.5 (1st Cir. 1998) ("[T]o be discoverable, information need only appear to be 'reasonably calculated to lead to the discovery of admissible evidence.'") (quoting Fed. R. Civ. P. 26(b)(1)). No more was exigible.

It is true, of course, that Rule 26 delineates additional safeguards with respect to expert testimony. For instance, the

rule obligates a party who wishes to offer such testimony to disclose, during pretrial proceedings, "the identity of any person who may be used at trial to present evidence under Rules 702, 703 and 705 of the Federal Rules of Evidence." Fed. R. Civ. P. 26(a)(2)(A). Even more stringent requirements pertain to "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). Such a witness must submit a written report containing, inter alia, detailed information as to the qualifications and intended testimony of the witness. Id. The defendants regarded Piñot as a fact witness, not an expert witness, and therefore omitted this information.

The district court disagreed with this taxonomy. It ruled that the defendants had misclassified Piñot and had thereby transgressed Rule 26. We find this ruling insupportable: the expert witness requirements do not affect a witness in Piñot's position.

Rule 26 uses the term expert "to refer to those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters." Fed. R. Civ. P. 26(a)(2) advisory committee's note to the 1993 amendments. That definition does not encompass a percipient witness who happens to be an expert. If the individual

-17-

is not providing testimony under Rule 702, he is not an expert witness for the purpose of Rule 26.  See id.

The advisory committee specifically used the example of a treating physician to illustrate the sort of witness who may have specialized knowledge yet need not be considered an expert for the purpose of submitting a report as part of pretrial discovery.  See id.  By and large, courts have followed the advisory committee's lead and ruled that a treating physician, testifying as to his consultation with or treatment of a patient, is not an expert witness for purposes of Rule 26.  See, e.g., NGO v. Stand. Tools & Equip. Co., 197 F.R.D. 263, 266 (D. Md. 2000); Mangla v. Univ. of Rochester, 168 F.R.D. 137, 139 (W.D.N.Y. 1996); Sipes v. United States, 111 F.R.D. 59, 61 (S.D. Cal. 1986).

The analogy is compelling.  The record in this case makes manifest that Piñot and the Mayor had met and discussed both the procedure for filling the new Law 52 slots and the Municipality's obligations to the former employees well before the occasion for litigation arose.  The Mayor claims that he acted on Piñot's advice.  Unquestionably, then, Piñot was a direct participant in the events at issue, and the record confirms that his testimony was offered to that end.  Like the testimony of a treating physician, Piñot's testimony would have been based on personal knowledge acquired before any litigation had begun.  He was an actor with regard to the occurrences from which the tapestry of the lawsuit

was woven, and the defendants sought to present his testimony on that basis.

The bottom line is that Piñot was a fact witness, and his first-hand testimony should have been considered under the standards that govern such witnesses — not under the special provisions that apply to expert witnesses. Consequently, the trial court's conclusion that there had been a discovery violation rested on a mistake of law. It follows inexorably that the court lacked authority to levy the preclusionary sanction — there was no transgression to punish.

Let us be perfectly clear. Piñot obviously has specialized knowledge by virtue of his position with DLHR and his chairmanship of the board that assesses and approves Law 52 proposals. But the triggering mechanism for application of Rule 26's expert witness requirements is not the status of the witness, but, rather, the essence of the proffered testimony. Patel v. Gayes, 984 F.2d 214, 218 (7th Cir. 1993); Fed. R. Civ. P. 26(a) advisory committee's note to the 1993 amendments. Accordingly, a party need not identify a witness as an expert so long as the witness played a personal role in the unfolding of the events at issue and the anticipated questioning seeks only to elicit the witness's knowledge of those events. See Patel, 984 F.2d at 217-18. Piñot fit into this niche. Thus, Rule 26 afforded no justification for the wholesale exclusion of his testimony.

**2. Legal Opinion**. Although we find the wholesale exclusion of Piñot's lay testimony insupportable as a discovery sanction, the defendants have another obstacle to overcome. When granting the plaintiffs' motion in limine from the bench, the district court commented that "any factual testimony that [Piñot] may offer [would be] inextricably conjoined to expert opinion and testimony"; that the witness would, in effect, wind up "interpret[ing] the law for the jury"; and that this concatenation of circumstances would infringe upon the judge's role as "the sole interpreter of Law 52 when instructing the Jury on the law." The court reiterated this point in rebuffing the defendants' post-trial motions. See Gómez II, 218 F. Supp. 2d at 87 (declaring that "no witness is allowed to interpret the law for the jury"). In voicing these sentiments, the court leaned heavily on our decision in Nieves-Villanueva, 133 F.3d at 99 (describing as "black-letter law" the postulate that it is for the judge, not the witnesses, to inform the jurors as to the applicable law). We deem this an alternative basis for excluding Piñot's testimony, and, thus, inquire into it.

We evaluate a trial court's decision to admit or exclude evidence for abuse of discretion. Pendleton v. City of Haverhill, 156 F.3d 57, 64 (1st Cir. 1998). This deferential standard applies because "[e]very trial presents a blend of idiosyncratic circumstances" — a reality that counsels in favor of affording the

-20-

presider some appreciable latitude in making evidentiary findings. United States v. Zaccaria, 240 F.3d 75, 78 (1st Cir. 2001). Despite the deference that is due, we are of the view that the court below went too far when it banned Piñot from testifying at all on the ground that his testimony would embody inadmissible legal opinion. Our reasoning follows.

Courts generally have held legal opinion testimony inadmissible under Fed. R. Evid. 702. See, e.g., Specht v. Jensen, 853 F.2d 805, 807-10 (10th Cir. 1988) (en banc); Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 508-11 (2d Cir. 1977). But these cases are inapposite here. As we already have explained, the defendants proposed to call Piñot as a fact witness, not an expert witness under Rule 702. See supra Part II(B)(1).

The fact that Piñot was a percipient witness makes a world of difference. Assuming for the sake of argument that Nieves-Villanueva announced a general evidentiary rule to the effect that legal opinion testimony is per se inadmissible,[6] that rule would not be implicated in these circumstances. After all, the rationale for excluding legal opinions is directed at excluding testimony as to ultimate legal conclusions. Thus, courts have held that a witness cannot testify that an appointment was made in

---

[6]There is good reason to believe that Nieves-Villanueva did not announce such a per se rule. See Nieves-Villanueva, 133 F.3d at 100 (discussing why expert legal opinions do not assist the trier of fact — a discussion that would have been unnecessary if the testimony were per se inadmissible).

violation of the law, e.g., Nieves-Villanueva, 133 F.3d at 99, or that a search was unreasonable and thus illegal, e.g., Specht, 853 F.2d at 808, or that contractual obligations have a particular legal effect, e.g., Marx & Co., 550 F.2d at 508. But courts "draw a clear line between permissible testimony on issues of fact and testimony that articulates the ultimate principles of law governing the deliberations of the jury." Specht, 853 F.2d at 808.

Piñot's proposed testimony clearly falls on the sunny side of this line. While his testimony was not admissible for the purpose of proving what obligations the law imposed upon the Mayor, it was admissible to show the Mayor's understanding at the time and his ensuing state of mind. See United States v. Cavin, 39 F.3d 1299, 1309 (5th Cir. 1994).

Of course, Piñot's testimony — like all testimony — would have been subject to the balancing test mandated by Evidence Rule 403 (which allows exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of . . . confusion of the issues[] or misleading the jury"). But the district court did not rely upon Rule 403 in excluding Piñot's testimony, and, in all events, the wholesale exclusion of that testimony cannot be justified under Rule 403. The Rule 403 balancing test applies statement by statement. See Kassel v. Gannett Co., 875 F.2d 935, 952 (1st Cir. 1989) (noting that the trial court "must balance the prejudicial effect and probative value of each statement offered").

To use the rule as an instrument for the wholesale exclusion of a percipient witness's testimony would be tantamount to allowing the presider to cut down the entire tree out of fear that some of the fruit might prove rotten. Rule 403 requires more delicate pruning of evidentiary proffers.[7] See id. (warning against throwing "out the baby with the bath water").

That ends this aspect of the matter. Although Piñot may well have testified as to the legal advice that he gave the Mayor, that is not the kind of legal opinion testimony that the case law deems wholly inadmissible. Accordingly, the blanket exclusion of Piñot's testimony constituted an abuse of the trial court's discretion.

## C. **The Mayor's Wife**.

The defendants also assert that the trial court erred in allowing Morales's testimony as to the substance of discussions she claims to have had with the Mayor's wife (Pinero). Morales testified over objection that Pinero interviewed her in an office in the town hall; that Pinero queried Morales's escort as to whether she (Morales) was a member of the PDP; and that, after receiving an assurance of Morales's political fealty, Pinero expressed an interest in hiring Morales as her secretary. She then

_____

[7]By the same token, Piñot's testimony would have been subject to limiting instructions. See United States v. Nivica, 887 F.2d 1110, 1119 (1st Cir. 1989). But the need to limit the jury's use of certain testimony does not give the trial court carte blanche to exclude it entirely.

asked for Morales's full name, stated that "Law 52 was going to be approved," and indicated that this created an opportunity for the new administration to hire PDP adherents.

The plaintiffs offered this testimony to prove the truth of the matter asserted, i.e., that the defendants acted out of a politically discriminatory animus in allowing the plaintiffs' Law 52 contracts to expire and in filling the new jobs with PDP partisans.  Because Pinero was not a party to the case, the testimony, on its face, was garden-variety hearsay.  See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").  As such, it was inadmissible unless it somehow escaped the normal hearsay prohibition.  To avoid this bar, the plaintiffs posited that Pinero's statements were not hearsay because they constituted admissions of a party-opponent.[8]  The defendants objected, pointing to the lack of an adequate foundation.  To counter this objection, the plaintiffs insisted that Pinero was a member of the Mayor's inner circle (and, therefore, an agent of the defendants).

_____

[8]The applicable Evidence Rule provides in relevant part that a "statement is not hearsay if . . . [it] is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d).

-24-

The district court overruled the defendants' objections, reasoning that "Mayor Rivera's wife was in fact an extension of the Mayor, and did in fact hold a position within the Municipality of Gurabo that was akin to his alter ego." The jury was then allowed to hear Morales's version of the conversation. The district court reiterated its earlier conclusion in the course of denying the defendants' post-trial motions, recalling that it had heard "repeated testimony that [Pinero] occupied an office at the Municipality" and that she "was conducting interviews of prospective employees on behalf of the Mayor." Gómez II, 281 F. Supp. 2d at 88. The court then stated that it was "common knowledge that wives of politicians often occupy positions of power and prestige within the government alongside their husbands." Id. We examine this ruling for abuse of discretion. See Pendleton, 156 F.3d at 64.

Parties wishing to introduce statements into evidence under the aegis of Rule 801(d)(2)(D) must establish, by a preponderance of the evidence, (1) that an agency relationship existed; (2) that the statements were made during the course of the relationship; and (3) that the statements relate to matters within the scope of the agency. Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 72 (1st Cir. 2001). Although the Evidence Rules do not define "agent" or "servant," federal courts grappling with Rule 801(d)(2)(D) proffers have adopted and applied the traditional

-25-

meanings of those terms as reflected in the federal common law of agency.  <u>See</u>, <u>e.g.</u>, <u>City of Tuscaloosa</u> v. <u>Harcros Chems., Inc.</u>, 158 F.3d 548, 557 n.9 (11th Cir. 1998); <u>Lippay</u> v. <u>Christos</u>, 996 F.2d 1490, 1497 (3d Cir. 1993).[9]

It is hornbook law that an agency cannot be proven solely by the unsupported out-of-court statements of the claimed agent. Although the contents of the putative agent's out-of-court statements may be considered in the decisional calculus, the statements "are not alone sufficient to establish the declarant's authority."  Fed. R. Evid. 801(d)(2).  For present purposes, then, Morales's testimony cannot be viewed as self-authenticating.  An agency relationship must be shown to exist by independent evidence before out-of-court statements by a purported agent can be deemed admissions by a party-opponent.  <u>Mackey</u> v. <u>Burke</u>, 751 F.2d 322, 326 n.3 (10th Cir. 1984); <u>United States</u> v. <u>Portsmouth Paving Corp.</u>, 694 F.2d 312, 321 (4th Cir. 1982).

Faced with the need to identify independent foundational facts, the plaintiffs point out that the determination of whether a party has built a proper foundation is left principally to the

---

[9]There is some play in the joints as to what a proponent must adduce to show that an agency relationship in fact existed. <u>Compare</u>, <u>e.g.</u>, <u>United States</u> v. <u>Rioux</u>, 97 F.3d 648, 660 (2d Cir. 1996) (requiring only that one is answerable and responsible to another), <u>with</u>, <u>e.g.</u>, <u>Lippay</u>, 996 F.2d at 1499 (requiring "continuous, supervisory control").  We need not dwell upon such fine distinctions:  the record here is devoid of any evidence sufficient to support a finding of agency under either standard.

sound discretion of the presider.  See United States v. Saccoccia, 58 F.3d 754, 782 (1st Cir. 1995).  Although we accept that truism, the trial court's discretion is not boundless.  See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998).  At a bare minimum, the requisite foundation demands something more than intuitive judgments emanating from broad generalities.  See Kissinger v. Lofgren, 836 F.2d 678, 683 (1st Cir. 1988) (stating that a proper foundation requires the proponent to adduce "'evidence sufficient to support a finding' that the evidence is what the proponent claims it to be") (quoting 5 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 901(a)); see also Fed. R. Evid. 104(b).  Here, there is no "more."

We have combed the record in this case and discovered no independent evidence sufficient to establish the requisite foundation.  To be sure, the district court said that Pinero was conducting interviews of prospective employees on the Mayor's behalf.  Apart from Morales's testimony, however, there is nothing to show that Pinero interviewed Morales (or any other prospective employee, for that matter) on behalf of the Mayor.  By like token, the court suggested that it "ha[d] to allow [the] testimony" because, "as the wife of the new Mayor," Pinero "was in charge of the political operations of the Municipality of Gurabo at the time."  This too is an uncorroborated ipse dixit; there is simply no proof that the Municipality, as a governmental entity, engaged

-27-

in "political operations" under the hegemony of the Mayor's wife either in this administration or as a matter of custom and practice. Nor is the fact that Pinero had a town hall office at her disposal sufficient to furnish the missing foundational support. In the ordinary course of events, many persons are assigned offices at the seat of government — but that placement does not confer wide-ranging authority upon all of them. To the extent that Pinero had political duties or responsibilities, the record does not contain any enumeration of them.

Similarly, Pinero's marriage to the Mayor, without more, does not demonstrate the formation of an agency relationship between them. The mere existence of a marital bond cannot serve as a proxy for competent proof of an agency relationship. Cf. Gannett v. Carp (In re Carp), ___ F.3d ___, ___ (1st Cir. 2003) [No. 02-2323, slip op. at 17] (noting that "[t]he sins of the husband are not automatically visited upon the wife"). While we are not blind to political realities — we recognize that spouses of elected officials can, and often do, exercise influence in matters of public concern — generalizations are no substitute for hard facts. See Blake v. Pellegrino, 329 F.3d 43, 48 (1st Cir. 2003). In this case, the absence of particularized evidence dooms the plaintiffs' argument.

In making this assessment, we find unhelpful the district court's statement that Pinero "was part of the political group that

had taken over the new administration." For aught that appears, that statement is based only on Pinero's PDP ties and her support for her husband's candidacy. If this were sufficient to make Pinero an agent of either the Mayor or the Municipality, then any member of the PDP would so qualify. That is not the law. See Restatement (Second) of Agency § 1 (1958) (defining agency).

In an effort to locate the missing link, the plaintiffs note that the Mayor testified during his deposition that his wife regularly collects information for him. That comment, offered in response to a question asking "in what way does your wife help you in . . . municipal affairs?," fails to prove the plaintiffs' point. When the interrogator inquired further, the Mayor made it clear that his wife's role was social in nature and that she played no part in the making of employment decisions.

To say more on this point would be supererogatory. Because the record reveals no evidence sufficient to sustain a finding that Pinero acted as an agent for either the Mayor or the Municipality in connection with the hiring of Law 52 employees, the district court abused its discretion in failing to exclude Morales's testimony as hearsay. See, e.g., Am. Eagle Ins. Co. v. Thompson, 85 F.3d 327, 333 (8th Cir. 1996); Lippay, 996 F.2d at 1496-99.

## D. **Effect of the Errors**.

We turn now to the cumulative effect of these errors. The analytic framework is familiar:  a district court's error necessitates a new trial only if it affects the complaining party's substantial rights.  See Fed. R. Civ. P. 61.  In general — the exceptions are not applicable here — this standard requires that the challenged ruling has had a substantial and injurious effect or influence upon the jury's verdict.  Ruiz-Troche, 161 F.3d at 87. To make this determination, a reviewing court must scrutinize the record as a whole and aggregate the collective effects of multiple errors.  See United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).  If the verdict is to stand, the court must be able to say with a fair degree of assurance that the error(s) did not skew the verdict.  Ruiz-Troche, 161 F.3d at 87.

We have thus far identified three errors, but the first of these is anchored in quicksand.  The district court's erroneous "property interest" ruling first manifested itself in its denial of summary judgment.  Gómez I, 218 F. Supp. 2d at 78-79.  That order is unappealable at this juncture.  The law is clear that, after trial, the denial of summary judgment merges into the verdict and cannot be assigned as error.  See Rivera-Torres v. Ortiz-Velez, ___ F.3d ___, ___ (1st Cir. 2003) [No. 02-2539, slip op. at 9-11]; Iacobucci v. Boulter, 193 F.3d 14, 22 (1st Cir. 1999).

-30-

The erroneous "property interest" ruling also cropped up in the district court's jury instructions. An incorrect jury instruction is, of course, appealable. Here, however, the defendants did not interpose a contemporaneous objection to the faulty instruction. See Fed. R. Civ. P. 51. Consequently, they did not preserve their claim of error. We have held fast to the proposition that "silence after instructions . . . typically constitutes a waiver of any objections." Wilson v. Maritime Overseas Corp., 150 F.3d 1, 9 (1st Cir. 1998) (citing Putnam Resources v. Pateman, 958 F.2d 448, 456 (1st Cir. 1992)). That is precisely what transpired here.

While a forfeited claim of error (such as a claim of instructional error unaccompanied by a contemporaneous objection) is almost always subject to plain error review, Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) (per curiam), that is a rigorous standard to satisfy, see United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001) (explaining that "[r]eview for plain error entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings"). In a nutshell, the defendants would have to show not only that the instructional error was obvious but also that the injustice was great.

Courts ought not to decide difficult, highly nuanced issues unnecessarily. In this instance, prudence dictates that we refrain from opining whether the defective instruction sinks to the level of plain error. Because the record contains other cognizable errors that in and of themselves require a new trial, see text infra, we are content to allow our comments on the "property interest" ruling to stand as a guide to the district court on retrial. See Rosaly v. Ignacio, 593 F.2d 145, 147-48 (1st Cir. 1979) (employing a similar strategy).

This brings us to the two evidentiary bevues (both of which were properly preserved). In employment discrimination cases, the factors that motivate a decision are central to the decisionmaker's liability in his personal capacity.[10] See Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 11 (1st Cir. 2000) (stating that a political discrimination claim "has no meaning absent the allegation of impermissible motivation"); see also Gómez I, 218 F. Supp. 2d at 77 (recognizing that "the information possessed by the defendant" is an important variable in that equation) (quoting Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir. 2002)). So viewed, the trial court's order barring Piñot's testimony in its entirety went to the heart of the contested issue. That testimony was the

---

[10]Because the Mayor sets policy for the Municipality, Rivera-Torres, ___ F.3d at ___ [slip op. at 33-36], the preclusion of Piñot's testimony also impacted the Municipality (and, thus, the "official capacity" defendants).

linchpin of the Mayor's claim that his actions were objectively reasonable; it would have corroborated the Mayor's version of why he did what he did. Consequently, its exclusion was plainly prejudicial. See Cavin, 39 F.3d at 1309 (finding that the exclusion of expert testimony regarding the considerations that face an attorney whose client is using his services to perpetrate fraud was reversible error as it "prevent[ed] the lawyer from effectively presenting his defense"); cf. Blake, 329 F.3d at 49 (finding prejudicial error when the trial court withheld evidence from the jury on matters that were vital to the case).

Here, moreover, the nisi prius court compounded the harmful effect of this error by refusing to allow the Mayor to testify as to the particular advice that he received from Piñot. When defense counsel pointedly protested that the aim of this line of questioning "was to ask [the Mayor] what did he do and what his understanding, good or wrong," might be, the court responded that the Mayor could not "say anything as to the law . . . [or why] he thought he was not violating any law." That ruling was erroneous, see supra Part II(B)(2), and accentuated the harm resulting from the wholesale exclusion of Piñot's testimony.

In fairness, the court did allow the Mayor to "testify that after he prepared the proposal[,] he asked for advice of the Secretary of Labor and after the advice given, he implemented the proposal accordingly. . . . He can say that he followed the advice

. . . without explaining . . . ." Although this was a step in the right direction, we agree with the defendants that it was not in any sense a satisfactory surrogate for Piñot's testimony. A reasonable juror could as easily draw from this skeletal framework the conclusion that the Mayor sought legal advice on how to slake his thirst for political revenge in a way that would survive a legal challenge. The disallowance of Piñot's testimony prevented the Mayor from placing factual flesh on these bare bones.

The trial court's error in allowing Morales's testimony was the final nail in the coffin. Without Pinero's statements, the plaintiffs' case was entirely circumstantial. With that evidence, the plaintiffs had the benefit of the proverbial "smoking gun." While circumstantial evidence can be sufficient for burden-shifting purposes in a discrimination case, see Desert Palace, Inc. v. Costa, 123 S. Ct. 2148, 2154-55 (2003), the distinction between circumstantial evidence and direct evidence can still be extremely important in front of a jury. Among other things, direct evidence can play a pivotal role in shifting the factfinder's attention from the credibility of the employee's complaint to the credibility of the employer's affirmative defense. See Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir. 1992). Given the likely impact of this rather powerful evidence, we cannot say with confidence that the jury would have reached the same verdict had it been excluded.

To summarize succinctly, we hold that the court's wholesale exclusion of Piñot's testimony, coupled with the admission of Morales's hearsay testimony, constituted prejudicial error. Since there is an unacceptably high risk that these rulings in cumulation tipped the decisional scales, the verdict cannot stand.

## E. **The Stipulation**.

Although we have found a new trial necessary, we still must address Rivera-Oyola's claim that she should not be part of that proceeding. She asserts that she is entitled to judgment because of Stipulated Fact No. 19 (the Stipulation), which states: "While executing or implementing the Mayor's order to not renew the Plaintiffs' contracts, defendant Rivera-Oyola was strictly following orders. She had no participation in the act or official decision not to renew Plaintiffs' contracts." She questions whether, in light of this stipulation, she could be found to have been culpably involved in any constitutional violation.

The district court determined that the Stipulation conflicted with Stipulated Fact No. 22 (reciting that Rivera-Oyola "drafted the Law 52 employees' termination letters") and Stipulated Fact No. 23 (reciting that she and the Mayor "discussed Plaintiffs' employment"). Additionally, the court reasoned that Rivera-Oyola's position required her to share her views with the Mayor and

-35-

collaborate with him in the formulation of policy.[11]  Accordingly, the court denied Rivera-Oyola's timely motions for summary judgment and judgment as a matter of law.  Rivera-Oyola renewed the latter motion after trial, but the district court again denied it.  Gómez II, 278 F. Supp. 2d at 86.

Because the court erroneously found a conflict where none existed and thus declined to enter judgment as a matter of law, we reverse and order the claims against Rivera-Oyola in her individual capacity dismissed.[12]  We explain briefly.

Stipulations in litigation are favored because they tend to expedite trial proceedings, eliminate the need for proving essentially uncontested facts, and husband scarce judicial resources.  See T I Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995).  Determining the meaning and effect of a stipulation presents a question of law, engendering de novo review.  Braxton v. United States, 500 U.S. 344, 350 (1991).  The question

---

[11]In this regard, the court noted that Rivera-Oyola held a position that was classified as a position of trust or confidence under local law, see generally Vazquez Rios, 819 F.2d at 322-26, and cited a statute indicating that such employees "collaborate substantially in the formulation of . . . public policy" and "advise directly" the head of the governmental unit.  3 P.R. Laws Ann. § 1350 (2000).

[12]The claims against Rivera-Oyola in her official capacity are essentially claims against the Municipality, see, e.g., Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993) ("An official capacity suit is, in reality, a suit against a government entity, not against the governmental actor."), and are thus unaffected by this conclusion.

is not whether the stipulation can be read in a way that supports the decision of the trial court, but, rather, whether the trial court read the stipulation correctly.  Id.

Stipulations are best "understood as the analogue of terms binding parties to a contract." T I Fed. Credit Union, 72 F.3d at 928.  Accordingly, the interpretation of a stipulation follows general contract law principles.  See id.  It is axiomatic that a contractual term should be construed in the context of the contract as a whole.  See Newport Plaza Assocs. v. Durfee Attleboro Bank (In re Newport Plaza Assocs.), 985 F.2d 640, 646 (1st Cir. 1993).  Every term should be given effect, and, thus, separate clauses should be reconciled whenever possible.  See FDIC v. Singh, 977 F.2d 18, 24 (1st Cir. 1992); see also Keystone Fabric Laminates, Inc. v. Fed. Ins. Co., 407 F.2d 1353, 1356 (3d Cir. 1969).

Rivera-Oyola asseverates that the Stipulation made it crystal clear that her role was purely ministerial (and, thus, non-culpable).  The district court rejected this asseveration, concluding that the Stipulation conflicted with other stipulated facts and, therefore, left a jury question.  But a fair reading of the Stipulation reveals no conflict at all.  A person (say, a secretary) can draft a dismissal letter and discuss the terminated employment with her boss without in any way participating in the decision to discharge the affected employee.

The statutory job description relied on by the district court, see supra note 11, in no way alters this analysis. As a matter of interpretation, specific terms typically trump general ones. See Edmond v. United States, 520 U.S. 651, 657 (1997); Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 21 n.8 (1st Cir. 2000). Here, the parties crafted the Stipulation to capture what had occurred on a particular occasion. That certainly carries far more weight than does a general statutory description that applies to a myriad of situations and a host of government employees.

In all events, the statutory description is not in conflict with the Stipulation. Rivera-Oyola may well formulate policy and provide advice in a large number of areas (including personnel matters). The Stipulation simply acknowledges that she took no part in a particular set of employment decisions. Counseled parties freely agreed upon this language, and we see no reason either to disturb or to distort the plain meaning of the language that they chose.

The plaintiffs argue that the Stipulation should be discounted because there are facts in evidence that conflict with it. That argument lacks force. For one thing, the plaintiffs do not point to any specific piece of evidence that actually contradicts the Stipulation. For another thing, the very purpose of a stipulation is to dispense with the need for proof of the

stipulated fact. Burstein v. United States, 232 F.2d 19, 23 (8th Cir. 1956). Thus, no evidence tending to establish facts contrary to the facts stipulated can be considered. See Gander v. Livoti, 250 F.3d 606, 609 (8th Cir. 2001). If the plaintiffs wished to show Rivera-Oyola's personal involvement in the decisionmaking process — a fact that would have conflicted directly with the Stipulation — they were obliged to seek relief from the Stipulation. See Burstein, 232 F.2d at 23. Absent such a request — and none was made in this case — the Stipulation is binding upon the parties and the court. See FDIC v. St. Paul Fire & Marine Ins. Co., 942 F.2d 1032, 1038 (6th Cir. 1991).

We are left only to determine the legal effect of the Stipulation. For the plaintiffs to show a deprivation of their constitutional rights — a finding necessary to recover under section 1983 — they had to prove that discrimination substantially motivated the defendant's adverse employment decisions. Mt. Healthy, 429 U.S. at 287. In a political discrimination case, this required proof that the actor (here, Rivera-Oyola) intended to discriminate. Rivera-Torres, ___ F.3d at ___ [slip op. at 19-20]; Feliciano-Angulo v. Rivera-Cruz, 858 F.2d 40, 45-46 (1st Cir. 1988); cf. Chavez v. Martinez, 123 S. Ct. 1994, 2000 (2003) ("In deciding whether an officer is entitled to qualified immunity, we must first determine whether the officer's alleged conduct violated a constitutional right.").

For purposes of this case, then, Rivera-Oyola cannot be personally liable to the plaintiffs unless she had a hand in the decision not to renew their Law 52 contracts and/or honor their applications for the newly created positions. There is no evidence at all that she participated in the hiring process. Thus, the case against her hinges on her role in the termination of the existing Law 52 agreements. The Stipulation defines that role. Giving the words their natural meaning, the Stipulation makes manifest that Rivera-Oyola had no hand in the relevant decisionmaking. Consequently, there is no way that the plaintiffs can carry their burden of showing that she was motivated by a constitutionally impermissible animus (and, thus, that she is subject to section 1983 liability). For this reason, the district court should have granted her motion for judgment as a matter of law and dismissed the claims against her in her individual capacity.

## III. CONCLUSION

We need go no further.[13] This was an enormously difficult case, and the able trial judge was forced to wrestle with a seemingly endless series of complex decisions. In such cases, perfect judicial scorecards are rare. Here, the court's errors were of sufficient magnitude to undermine confidence in the jury's

---

[13]Although the appellants advance other assignments of error, they involve either matters that are informed by this opinion (and, thus, unlikely to be repeated) or matters relating to remediation (and, thus, mooted by the vacation of the judgment). Consequently, we need not deal with them.

verdict.  We have no principled choice, therefore, but to reverse the judgment and to direct that the case be retried.  The exception, of course, is the action against Rivera-Oyola in her individual capacity, which ought to be dismissed.

**Reversed and remanded with instructions**.  **Costs shall be taxed in favor of the defendants**.

| **PLAINTIFF** | **DEFENDANT**[*] | **AMOUNT AWARDED** |
|---|---|---|
| 1. María Gómez Candelaria | Municipality | $30,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 2. Abraham Vázquez Martínez | Municipality | $30,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,499 (punitive) |
| | Rivera-Oyola | $150 (punitive) |
| 3. Claribel Rodríguez Molina | Municipality | $25,000 (compensatory) |

[*]Damages awarded against the Municipality also run against the other defendants in their official capacities. Amounts awarded against the individual defendants were awarded against them in their personal capacities.

|  |  | $15,000 (back pay) |
|---|---|---|
|  | Rivera-Rodríguez | $1 (nominal) |
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) |
|  |  | $149 (punitive) |
| 4. Grisel I. Calderin Laboy | Municipality | $25,000 (compensatory) $15,000 (back pay)- $1,500 (failure to mitigate) = $13,500 |
|  | Rivera-Rodríguez | $1 (nominal) |
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) |
|  |  | $149 (punitive) |
| 5. Abraham Carrasquillo Rodríguez | Municipality | $32,000 (compensatory) $15,000 (back pay) - $750 (failure to mitigate) = $14,250 |

|   | | Rivera-Rodríguez | $1 (nominal) |
|---|---|---|---|
|   | | | $2,499 (punitive) |
|   | | Rivera-Oyola | $1 (nominal) |
|   | | | $149 (punitive) |
| 6. | Rafael Coss Orellana | Municipality | $27,000 (compensatory) $15,000 (back pay) - $750 (failure to mitigate) = $14,250 |
|   | | Rivera-Rodríguez | $1 (nominal) |
|   | | | $2,499 (punitive) |
|   | | Rivera-Oyola | $1 (nominal) |
|   | | | $149 (punitive) |
| 7. | Olga Marín González | Municipality | $32,000 (compensatory) $15,000 (back pay) |
|   | | Rivera-Rodríguez | $1 (nominal) |
|   | | | $2,499 (punitive) |
|   | | Rivera-Oyola | $1 (nominal) |
|   | | | $149 (punitive) |

| | | |
|---|---|---|
| 8. Edna G. Rivera Medína | Municipality | $30,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 9. Raquel Barbosa Cortés | Municipality | $35,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 10. Debby Soto Viera | Municipality | $25,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) $149 (punitive) |

| | | |
|---|---|---|
| 11. Santos Román Rodríguez | Municipality | $33,000 (compensatory) |
| | | $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) |
| | | $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) |
| | | $149 (punitive) |
| 12. José L. Cadiz Picart | Municipality | $30,000 (compensatory) |
| | | $15,000 (back pay) - $1,500 (failure to mitigate) = $13,500 |
| | Rivera-Rodríguez | $1 (nominal) |
| | | $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) |
| | | $149 (punitive) |
| 13. José L. Cortés Morales | Municipality | $35,000 (compensatory) |
| | | $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) |

|  |  |  |
|---|---|---|
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) |
|  |  | $149 (punitive) |
| 14. Luis E. Ortiz Delgado | Municipality | $30,000 (compensatory) $15,000 (back pay) - $3,750 (failure to mitigate) = $11,250 |
|  | Rivera-Rodríguez | $1 (nominal) |
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 15. Zenaida Pérez Vega | Municipality | $33,000 (compensatory) $15,000 (back pay) |
|  | Rivera-Rodríguez | $1 (nominal) |
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 16. Mariel Adorno Santiago | Municipality | $30,000 (compensatory) |

|  |  |  |
|---|---|---|
|  |  | $15,000 (back pay) - $4,500 (failure to mitigate) = $10,500 |
|  | Rivera-Rodríguez | $1 (nominal) |
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 17. María V. Amadeo Huertas | Municipality | $27,000 (compensatory) $15,000 (back pay) |
|  | Rivera-Rodríguez | $1 (nominal) |
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 18. Inés Hernández Barbosa | Municipality | $30,000 (compensatory) $15,000 (back pay) |
|  | Rivera-Rodríguez | $1 (nominal) |
|  |  | $2,499 (punitive) |
|  | Rivera-Oyola | $1 (nominal) $149 (punitive) |

| | | |
|---|---|---|
| 19. Brenda L. Alamo Sánchez | Municipality | $40,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,999 (punitive) |
| | Rivera-Oyola | $1 (nominal) $249 (punitive) |
| 20. Carlos J. Hidalgo | Municipality | $30,000 (compensatory) $15,000 (back pay) - $3,0000 (failure to mitigate) = $12,000 |
| | Rivera-Rodríguez | $1 (nominal) $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) $149 (punitive) |
| 21. Angel Luis Arroyo Guzmán | Municipality | $30,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,499 (punitive) |

| | | |
|---|---|---|
| | Rivera-Oyola | $1 (nominal) |
| | | $149 (punitive) |
| 22. Rafael Nazario Rodríguez | Municipality | $32,000 (compensatory) |
| | | $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) |
| | | $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) |
| | | $149 (punitive) |
| 23. Jackeline Delgado Burgos | Municipality | $25,000 (compensatory) |
| | | $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) |
| | | $2,499 (punitive) |
| | Rivera-Oyola | $1 (nominal) |
| | | $149 (punitive) |

| | | |
|---|---|---|
| 24. Shirley M. Morales Rivera | Municipality | $30,000 (compensatory) $15,000 (back pay) |
| | Rivera-Rodríguez | $1 (nominal) $2,999 (punitive) |
| | Rivera-Oyola | $1 (nominal) $249 (punitive) |